In re AMATEX CORPORATION, formerly known as American Asbestos Textile Corporation, Debtor.

AMATEX CORPORATION, Plaintiff,

v.

The AETNA CASUALTY AND SURETY COMPANY, Defendant.

AMATEX CORPORATION, Plaintiff,

v.

STONEWALL INSURANCE COMPANY, Defendant.

AMATEX CORPORATION, Plaintiff,

v.

INTERSTATE FIRE AND CASUALTY COMPANY, Defendant.

AMATEX CORPORATION, Plaintiff,

v.

BELLEFONTE INSURANCE COMPANY, Defendant.

Bankruptcy No. 82–05220S.

Adv. Nos. 88–0615S to 88–0618S.

United States Bankruptcy Court, E.D. Pennsylvania.

March 10, 1989.

J. Gregg Miller, Philadelphia, Pa., for debtor.

Pace Reich, Philadelphia, Pa., for Health Claimants Committee.

Charles V. Stoelker, Jr., Philadelphia, Pa., Guardian ad Litem.

William H. Bradbury, III, Norristown, Pa., for debtor-special counsel.

Robert P. Corbin, Philadelphia, Pa., for Stonewall.

Joseph A. Gindhart, Philadelphia, Pa., for Bellefonte.

James M. Matour, Philadelphia, Pa., for Guardian at litem.

Myron A. Bloom, Philadelphia, Pa., for Unsecured Creditors' Committee.

Leonard P. Goldberger, Philadelphia, Pa., for Aetna.

Mitchell S. Pinsly, Philadelphia, Pa., for Interstate.

Peter A. Dunn, Media, Pa., for American.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The parties have stipulated that the only issue that we need decide in the above-enti-

tled four very similar adversary proceedings at this juncture is whether, pursuant to the equitable powers vested in this court by 11 U.S.C. § 105(a), we can compel the defendant-insurers, contrary to the terms of their policies, to make lump-sum payments to the Debtor on account of liabilities which the Debtor, a former manufacturer and vendor of asbestos products, contends "will inevitably become due and payable" to it under those policies. As we do not believe that our equitable powers, under § 105(a) or otherwise, can stretch so far as to alter contractual rights established under state law in a manner not expressly authorized by the Bankruptcy Code, we conclude that we cannot grant the relief requested. Consequently, we proceed to dismiss three of these proceedings entirely and dismiss the first three counts, stating similar causes of action, in the other.

The underlying Chapter 11 bankruptcy case was filed by the Debtor, AMATEX CORPORATION, formerly known as American Asbestos Textile Corporation, on November 1, 1982. Though on a smaller scale, this case bears certain similarities to *In re Johns–Manville Corp.*, Bankr. No. 82 B 11656 176, commenced in August, 1982, in the Southern District of New York, and *In re UNR Industries, Inc.*, Bankr. Nos. 82 B 9841 to 9845, 9849, and 9851, commenced in the Northern District of Illinois on July 29, 1982. Like those cases, it was among the first Chapter 11 cases initiated by manufacturers of asbestos-related products who were deluged with lawsuits and prospects of additional suits as asbestos-related damage claims manifested themselves over time.

On December 23, 1982, the Debtor introduced a provocative issue into the case by requesting the appointment of a *guardian ad litem* in this proceedings to protect the rights of parties having future asbestos-related claims against the Debtor. This issue, although decided adversely to the Debtor in this court and in an appeal to the district court, was ultimately decided in the Debtor's favor in a landmark decision by the Third Circuit Court of Appeals, reported at 755 F.2d 1034 (3d Cir.1985).

The undersigned (referred to hereinafter in the first person plural) inherited this case upon taking the bench on August 27, 1986. However, there was extremely little activity of any substance initiated by any of the parties presumably interested in this case from the date that the Court of Appeals denied a rehearing en banc in the Appeal on the *guardian ad litem* issue on April 2, 1985, through the date of our appointment and thereafter.

In late 1987 and early 1988, in reviewing the status of all of our Chapter 11 cases, we *sua sponte* entered an Order of January 15, 1988, scheduling a status hearing in this case on February 17, 1988. After the status hearing, we entered an Order of February 18, 1988, which, *inter alia*, directed the Debtor's counsel to prepare a status report, focusing on the issues to be resolved before a successful Plan of reorganization could be confirmed; invited all other interested counsel to respond; and scheduled a further status hearing on May 3, 1988.

After review of these reports and the May 3, 1988, hearing, we became aware that resolution of certain litigation against the Debtor's various insurers, the nature of which was not then further explained, was believed to be necessary before a successful Plan of reorganization could take shape. No explanation was presented as to why no effort to resolve these insurance issues had been made previously without our prompting and thus why this relatively large and important case was allowed, by all interested parties, to remain dormant for almost three years. Due to our prodding, the first case, against AMERICAN UNIVERSAL INSURANCE CO. (hereinafter "American") was filed on April 28, 1988. Four more complaints were filed on May 12, 1988, against the other insurers, AETNA CASUALTY AND SURETY CO. (hereinafter "Aetna"), STONEWALL INSURANCE CO. (hereinafter "Stonewall"), INTERSTATE FIRE AND CASUALTY CO. (hereinafter "Interstate"), and BELLEFONTE INSURANCE CO. (hereinafter "Bellefonte") (all of the foregoing party-defendants in these adversarial proceedings

are referred to throughout as "the insurers").

Two conferences later, on June 29, 1988, we executed a proffered First Procedural Order Re: Insurance Litigation, relating to all of these proceedings. Pursuant thereto, the dates for completion of discovery and scheduling of a pre-trial conference were to be triggered by the completion of an actuarial report by the Tillinghast Company, which would estimate the Debtor's ultimate liability on asbestos-related claims. This report was to be forwarded to the court by the Debtor within one day of its completion. Although the report was completed on September 13, 1988, it was, for reasons again unexplained, not forwarded to the court until December 14, 1988. In accordance with the terms of the First Procedural Order, we then immediately entered an Order scheduling a pre-trial conference in these proceedings on January 18, 1989. On that date, we learned that the proceeding against American had been settled but that all other proceedings would have to be resolved by this court. On the following day, we entered a pre-trial Order scheduling a consolidated trial of all four remaining proceedings on March 1, 1989, with the exception of a claim against Aetna only that it had breached its fiduciary duty to deal in good faith and defend the Debtor in a series of actions. Therein, we directed the parties to prepare a Stipulation of Facts and pre-trial Briefs by February 23, 1989.

Although the parties submitted the Briefs slightly belatedly, they presented a Joint Pre-trial Memorandum which contained all of the facts which they believed were necessary to prepare for the trial on March 1, 1989. The policies were also attached to separate Stipulations with the individual insurers. The Tillinghast report was also admitted into the record, as well as a deposition of the Debtor's house counsel, Victor L. Drexel, Esquire.

Per these materials, it was established that 11,707 lawsuits had been instituted against the Debtor prepetition, of which 9,315 were pending and hence were stayed at the time of the bankruptcy filing. The Tillinghast report estimated the total cost of the open claims against the Debtor to range between $16 million and $24 million. Future claims were estimated to fall within a cost range of $200 million to $350 million.

By way of contrast, the maximum insurance coverage provided in the policies of the respective insurers was as follows:

Aetna
General Liability
1970 to 1976 (6 years)
at $300,000/yr.                    $1.8 million
Excess Coverage
1973 to 1976 (3 years)
at $1 million/yr.                  3.0 million
American
General Liability
1976 to 1979 (3 years)
at $500,000/yr.                    1.5 million
Bellefonte
Excess Coverage
1976–77 (1 year)                    .5 million
Stonewall
Excess Coverage
1976–77 (1 year)                   1.0 million
Interstate
Excess Coverage
1977–79 (2 years) at
$1 million/yr.                     2.0 million

TOTAL        $9.8 million

The payments made by each of the insurers, on account of these policies to date, were stipulated to be as follows:

| Company | Indemnity | Expenses |
|---|---|---|
| Aetna | $2,255,177 | $4,854,001 |
| American | 607,595 | 2,735,915 |
| | $2,763,372 | $7,589,916 |

The coverage remaining under these policies is apparently agreed to be slightly over $9 million. The entire amount of the excess coverage provided by Bellefonte, Stonewall, and Interstate is available, because none of this coverage has as yet been reached.

Each of the policies provides that the respective insurer will pay only sums "which the insured shall become legally obligated to pay as damages" for bodily injury or property damage. As the parties apparently agree, each of these policies are hence "indemnity contracts." In such policies, the insured can ordinarily not collect any monetary recovery from the insurer until it has suffered an actual monetary

loss as a result of the insured risk. *See West v. McMillan*, 301 Pa. 344, 347–48, 152 A. 104, 105 (1930). The Debtor concedes that no legal liability has yet arisen as to the large body of claims against it and hence, that, under the policies' terms, it cannot collect any recovery against the insurers. Nevertheless, it requests this court, as a "court of equity," to exercise its powers under 11 U.S.C. § 105(a) to compel the insurers to contribute lump-sum payments to the Debtor's reorganization Plan, allowing the Plan to take the shape of that confirmed in the *Manville* bankruptcy. *See Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988).

We should at this point relate a short history of the Debtor's efforts to file a Plan of reorganization. An initial Plan was filed on March 7, 1983. An extension of exclusivity was denied on April 14, 1983. A Disclosure Statement was filed on May 17, 1983. The hearing scheduled to consider the Disclosure Statement was then "rescinded" on July 6, 1983. No further Plan or Disclosure Statement appeared until November 1, 1988, when an Amended Plan and Disclosure Statement was filed, due only to our imposition of that date as a deadline for such filings in an Order of June 8, 1988. However, no notice was sent, nor was a date for a hearing on the Amended Disclosure Statement established, as is required by Local Bankruptcy Rule 3016.1(a) (hearing is to be requested within 15 days after filing of Disclosure Statement). Observing this deficiency, we directed, in an Order of November 17, 1988, that notice of the filing of the Amended Disclosure Statement be provided by December 16, 1988, and that a hearing on the Statement be conducted on January 18, 1989. On the latter date, on which we also conducted the Pre-trial conference in these adversary complaints, the Debtor's counsel indicated that a Second Amended Plan and Disclosure Statement would be required, which we directed to be filed by February 21, 1989. A hearing on the Second Amended Disclosure Statement has been scheduled for March 22, 1989.

The Second Amended Plan contemplates contributions of about $4.4 million from the Debtor, which is its value as a going concern; $1.34 million, representing the Debtor's contribution from net operating income for the forthcoming twenty years (until 2010); and $9.028 million representing the "potential proceeds" of the insurance policies. It is the Debtor's apparent position that exercise of this court's extraordinary equitable powers is necessary to permit the already-long-delayed Plan-confirmation process to proceed to fruition.

The proceedings on March 1, 1989, turned out to be confined to the oral argument of what was substantively a motion to dismiss the entire Complaints filed against Bellefonte, Stonewell, and Interstate, and dismiss all but Counts IV and V of the Complaint against Aetna (which Counts recite the breach of good faith claim and a request for a $64,000 reimbursement under an agreement of March 17, 1982, to share certain expenses, respectively). Separate counsel representing all of the insurers, following the lead of counsel for Aetna, as well as counsel for the Debtor, ultimately agreed that this court had jurisdiction over the proceedings and that, assuming *arguendo* that they were non-core, we could proceed to determine them. *See* 28 U.S.C. § 157(c)(2). It was also agreed that what the insurers had articulated in their Briefs as a contest of the court's jurisdiction to hear these matters was in fact a contention that the Debtor's complaints failed to state a cause of action and were hence vulnerable to dismissal under Bankruptcy Rule (hereinafter "B.Rule") 7012(b) and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 12(b)(6).

Further reflection causes us to observe that, since the parties presented matters outside of the pleadings for us to consider in rendering our decision at this point, we cannot, technically, proceed under F.R. Civ.P. 12(b)(6). Rather, it is more accurate to characterize what the parties were asking us to do as ruling on motions for summary judgment presented by the insurer-defendants. *See* F.R.Civ.P. 12(b)(6). We shall therefore treat the motion as one

presented to us under B.Rule 7056 and F.R.Civ.P. 56(b).

The Debtor candidly concedes, as it must, that the insurance contracts between the parties do not oblige the insurers to make lump-sum payments as it demands, *i.e.,* to pay the full extent of their coverage liability at this point, prior to the Debtor's becoming legally liable for same.[1] It also concedes that, under the law of Pennsylvania as in all other jurisdictions, insurers are required to reimburse insured parties only in accordance with the terms of the parties' insurance contracts. *See, e.g., Commercial Union Ins. Co. v. Pittsburgh Corning Corp.,* 789 F.2d 214, 220–21 (3d Cir.1986); *Terra Nova Ins. Co. v. Thee Kandy Store, Inc.,* 679 F.Supp. 476, 478 (E.D.Pa.1988); *McCorkle v. Firemen's Ins. Co. of Newark, N.J.,* 678 F.Supp. 562, 563 (W.D.Pa. 1988); and *Wilson v. Maryland Cas. Co.,* 377 Pa. 588, 592, 105 A.2d 304, 306 (1954). Further, the Debtor makes no contention that any ambiguities exist in the insurance contracts on this point, which could result in an interpretation in favor of requiring immediate lump-sum payments of the full extent of the policies' coverage to the Debtor. *Compare, e.g., In re Leedy Mortgage Co.,* 76 B.R. 440, 445–46 (Bankr.E.D.Pa. 1987).

Rather, the Debtor, in his Brief, requests relief on the basis of the following line of reasoning: (1) Insurers made lump-sum payments in lieu of contributions in the *Manville* bankruptcy and the huge Dalkon Shield bankruptcy case, *In re A.H. Robins Co.,* Bankr. No. 85–01307–R (E.D.Va.); (2) The insurers themselves were accorded very broad relief from the automatic stay as a result, *MacArthur Co. v. Johns–Manville Co.,* 837 F.2d 89, 91–94 (2d Cir.1988); and *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 998–1009 (4th Cir.1986), which the insurers here should also (happily) receive; (3) Both of these Plans were confirmed. *Kane, supra;* and *In re A.H. Robins Co.,* 88 B.R. 742 (E.D.Va.1988); and (4) We should allow the Debtor to proceed with the same sort of Plan here.

There is, of course, an important distinction between those cases and the instant case. The insurers here, in contrast to the insurers there, have not agreed to make lump-sum payments in lieu of fulfilling their contractual obligations under the policies. Since the Debtor is merely a tag-along defendant with other parties in many cases in which it is named, the insurers apparently do not place much value on any extension of the ordinary scope of the automatic stay to protect their interests. Certainly, there has been no flock of claimants seeking to obtain relief to proceed against the Debtor.

However, in the name of expediency and the need to get on with administration of this long-delayed case, the Debtor rather unabashedly asks us to overcome the hurdle of the insurers' unwillingness to agree to make lump-sum payments. It points out that the present and future claims which it is estimated will be filed against the Debtor will clearly exceed the limitations of coverage. Therefore, the Debtor argues that it is infinitely practical to, in effect, *make* the insurers agree to cash out their policies, as the insurers agreed to do in *Manville* and *Robins.* The authority for our power to leap over the tall impediment of the terms of the insurance contracts is "superclause," *i.e.,* 11 U.S.C. § 105(a), which reads as follows:

§ 105. Power of court.

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

---

1. In its Complaint against Aetna, the Debtor also seeks payment of a ten (10%) percent "return on the investment," which benefit Aetna purportedly received by reason of the alleged delay in fulfilling its obligation to indemnify the Debtor to the extent of full coverage by reason of the automatic stay (and the delays in the administration of the case) to date.

At oral argument, the Debtor embellished this point by stating that the Bankruptcy Code allows all sorts of contract modifications (reference to 11 U.S.C. § 365(f), which bars anti-assignment clauses in leases, was made). Thus, it argued, the requested modification of the terms of the insurance contracts here was not such an extraordinary request.

Resolution of a legal matter on the basis of F.R.Civ.P. 56(b) is a matter not to be taken lightly, and judgment is to be granted in favor of a defendant in this procedural setting only if it is clear, from examination of the pleadings and other evidentiary material, that no issue as to any material fact remains for trial and the defendant is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976); *In re Jackson,* 92 B.R. 987, 990–91 (Bankr.E.D.Pa.1988); and *In re Saler,* 84 B.R. 45, 48, 50 (Bankr.E.D.Pa.1988). However, in circumstances such as those presented by the instant case, where a plaintiff must sustain a rather remarkable legal assertion in order to succeed in asserting a successful cause of action, application of F.R.Civ.P. 56(b) seems totally appropriate.[2]

This court has been very cautious in exercising our powers under § 105(a) in the few instances where it has done so. *See In re Monroe Well Service, Inc.,* 67 B.R. 746, 747 (Bankr.E.D.Pa.1986) (court "very reluctantly" exercises powers) (FOX, J.); and *In re Metro Transportation Co.,* 64 B.R. 968, 974 (Bankr.E.D.Pa.1986) (use reserved for "an extraordinary set of circumstances"). Moreover, in both of the foregoing cases, we merely extended the use of § 105(a) as a shield, to extend the application of the bankruptcy stay slightly beyond the confines of § 362(a). That Code Section was

not used, as the Debtor here proposes, as a sword to compel a non-debtor party to act in a certain fashion. We have also made it clear that § 105(a) cannot be utilized "as a justification for our proceeding to take otherwise doubtfully authorized judicial actions," *In re Telephonics, Inc.,* 85 B.R. 312, 318 (Bankr.E.D.Pa.1988), or "'as a loose cannon ... to support otherwise insupportable claims.'" *In re University Medical Center,* 82 B.R. 754, 758 (Bankr.E.D.Pa. 1988) (quoting *In re Latimer,* 82 B.R. 354, 364 (Bankr.E.D.Pa.1988)).

Restrictions on the equitable powers of bankruptcy courts arising out of § 105(a) have been the subject of several pronouncements by the Supreme Court. In *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988), the Court unanimously held that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." This statement is exemplified by the Court's earlier admonition that bankruptcy courts are subject to the Contract Clause and the Fifth Amendment of the federal Constitution. *United States v. Security Industrial Bank,* 459 U.S. 70, 74–75, 103 S.Ct. 407, 410–11, 74 L.Ed.2d 235 (1982). The same principles were also expressed in *Butner v. United States,* 440 U.S. 48, 55–56, 99 S.Ct. 914, 918–19, 59 L.Ed.2d 136 (1979), where the court held that the substance and remedies provided under state-law must be the guiding force of bankruptcy-court decisions rather the "demands of equity." *See also Heiser v. Woodruff,* 327 U.S. 726, 732–36, 66 S.Ct. 853, 855–58, 90 L.Ed. 970 (1946) (bankruptcy courts are not empowered to re-examine issues determined by state courts despite their equitable powers).

Therefore, we can safely conclude, as the Third Circuit Court of Appeals has stated, that "section 105(a) does not authorize the

---

**2.** The result here would undoubtedly be the same even if we applied the test for granting a motion under F.R.Civ.P. 12(b)(6), *i.e.,* that "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" 2A J. MOORE, FEDERAL PRACTICE ¶ 12.07 [2.–5], at 12–65 (2d ed. 1988) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). *See, e.g., Commonwealth of Pa. ex rel. Zimmerman v. Pepsico, Inc.,* 836 F.2d 173, 175, 181, 184 (3d Cir.1988); and *In re Tucci,* 81 B.R. 320, 320–21 (Bankr.E.D.Pa.1988).

bankruptcy court to create rights not otherwise available under applicable law." *Southern Ry. v. Johnson Bronze Co.,* 758 F.2d 137, 141 (3d Cir.1985). The other Circuit Courts of Appeal which have addressed the issue concur. *See Official Committee of Equity Security Holders v. Mabey,* 832 F.2d 299 (4th Cir.1987) (bankruptcy court not empowered to establish a program to benefit only certain claimants despite the special needs of these parties); *In re Shoreline Concrete Co.,* 831 F.2d 903, 905 (9th Cir.1987) (equities employed by bankruptcy court must be within the contour of the law as written); *In re Ozark Restaurant Equip. Co.,* 816 F.2d 1222, 1230 (8th Cir.1987) (bankruptcy court has no equitable power to confer standing on a party otherwise absent); *In re Chicago, M. St. P. & P. R.R.,* 791 F.2d 524, 528 (7th Cir.1986) (the fact that a bankruptcy proceeding is equitable "does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be"); *United States v. Sutton,* 786 F.2d 1305, 1307–08 (5th Cir.1986) (bankruptcy court may only fashion relief on the basis of § 105(a) which is consistent with the provisions of the Bankruptcy Code); and *Johnson v. First Nat'l Bank,* 719 F.2d 270, 273–75 (8th Cir. 1983) (despite that bankruptcy court is a court of equity, it must determine property rights in accordance with state law unless Code provisions specifically allow otherwise).

Not surprisingly, this court has followed the principles established in these cases. *See, e.g., In re Farmer,* 81 B.R. 857, 861–62 (Bankr.E.D.Pa.1988) (§ 105(a) cannot be utilized to toll redemption period of § 108(b)); *Tucci, supra,* 81 B.R. at 324–25 (§ 105(a) cannot be utilized to extend period to attack a discharge order); and *In re Dunckle Associates, Inc.,* 19 B.R. 481, 485–86 (Bankr.E.D.Pa.1982) (secured creditor not entitled to claim a super-priority lien for costs of winterizing the debtor's premises on the basis of § 105(a)).

Application of the foregoing principles to the facts at hand results in a rather apparent conclusion that the position of the insurers, even in the context of a F.R.Civ.P. 56(b) motion, must be sustained. The use of our equitable powers which is urged by the Debtor in these proceedings would fly directly in the face of very basic tenets of Pennsylvania insurance law, *i.e.,* it would require us to order insurers to remit payments to an insured party which are admittedly not otherwise due under unambiguous terms of the policies. *Compare, e.g., Commercial Union, supra,* 789 F.2d at 220–21 (duty of insurer to defend insured does not exist independently from obligation to indemnify asbestos manufacturer); *Cissell v. American Home Assurance Co.,* 521 F.2d 790, 792 (6th Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976) (where policy required that a judgment required that a judgment be obtained against the insured before liability attached, bankruptcy trustee could not obtain a recovery simply because there was a filing of claims in the bankruptcy court against debtor); and *UNR Industries, Inc. v. American Mutual Liability Ins. Co.,* 92 B.R. 319, 330–31 (N.D.Ill.1988) (where no judgment was entered against the insured, no right of contribution on the part of the insurer arose under an insurance policy). As particularly *Butner, supra,* 440 U.S. at 48–49, 99 S.Ct. at 914–15; and *Johnson, supra,* 719 F.2d at 723–25, emphasize, this court is not authorized, pursuant to § 105(a), or any other authority, to disregard established state law principles in providing relief to the Debtor.

The Debtor can point to no section of the Bankruptcy Code, except for § 105(a), as authority for modifying the contract rights of the parties in the manner that it seeks to do here. Thus, this is not a situation where, as in the case of 11 U.S.C. § 365(f), a modification of contractual rights is expressly authorized under the Code.

Further, we concur with the statement in *Chicago, M. St. P. & P. R.R.,* 79 F.2d at 528, that a bankruptcy court is not empowered to utilize "free-floating discretion" to grant the Debtor here relief simply because it asserts strong policy reasons to support its position. *See Groff v. State Farm Fire & Cas. Co.,* 646 F.Supp. 973, 974 (E.D.Pa.

1986) (fact that exclusion of insurance coverage may be contrary to public policy is irrelevant to the determination of whether coverage is included under an insurance policy).

We therefore conclude that, at least as to all but Counts IV and V of the Debtor's Complaint against Aetna, we are indeed presented here with a situation where it appears, beyond doubt, that the plaintiff could prove no set of facts which could possibly entitle it to the relief sought. Therefore, the insurers are entitled to judgment, as to the claims in issue, as a matter of law. All but Counts IV and V of the Complaint against Aetna are therefore properly subject to dismissal pursuant to B.Rule 7056 and F.R.Civ.P. 56(b).

We will so order.